**Affirmed as modified; Opinion Filed August 20, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-17-00346-CR
_____

**DENISE ROCHELLE ROSS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-15-75745-Q**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Evans, and Schenck
Opinion by Justice Evans

A jury convicted Denise Rochelle Ross of felony murder and assessed punishment at sixty years' confinement and a $10,000 fine. In three issues, appellant argues the evidence is insufficient to prove she committed the predicate felony of practicing medicine without a license. The State brings a cross-issue requesting we reform the trial court's judgment to reflect that the jury made an affirmative deadly-weapon finding. After reviewing the record, we modify the trial court's judgment as requested and affirm the trial court's judgment as modified.

### BACKGROUND

On the morning of February 19, 2015, Wykesha Reid was found dead lying on a table in a room inside a salon at 3815 East Side Avenue, near the Deep Ellum area of Dallas. Reid was found by "Alicia," who called 9-1-1. Investigation revealed that Reid had received silicone

injections in her buttocks probably between four and eighteen hours before the body was found. Some of the silicone had entered Reid's blood and caused a pulmonary embolism resulting in her death. Appellant was ultimately charged with causing Reid's death by injecting her with silicone.

The salon where Reid was found was leased about one or two months earlier by Deshonte Robinson and her boyfriend, Keith Walker. Robinson was an eyelash extension technician who had known appellant, whom she called "Wee Wee," for about seven years. Robinson testified appellant approached her about finding a shop and offered to help pay the rent. According to Robinson, when appellant made this offer, appellant was working doing "butt injections." Robinson had witnessed appellant performing the injections with Alicia at a house in the Oak Cliff area of Dallas. Robinson ultimately found the 3815 East Side location, and Walker co-signed the lease for the property because he had better credit. There was one private room in the salon, but Robinson did not work in it. She worked in the main area of the salon. According to Robinson, appellant and Alicia used the private room to perform injections. Robinson, Alicia, and appellant each had a key to the salon.

Robinson testified that she arrived at the salon about 5:30 p.m. on February 18, 2015 to meet a lash client. The door to the private room was closed, and there were other people unfamiliar to Robinson sitting in the waiting area. Robinson first saw appellant that night when she came out of the private room around 6:30 and asked Robinson to turn up the volume on the radio. Appellant then returned to the room. About thirty to forty-five minutes later, appellant came back out and told those in the waiting area to leave and asked Robinson to ask her client to leave because the owner called and complained the music was too loud. Robinson questioned appellant as to why the owner would call appellant. Robinson told her client she would finish her in the morning, and appellant offered to pay for the lashes. While Robinson was cleaning up, appellant told her she could leave too, so she got her stuff together and went home.

Robinson called appellant the next morning around 7:00 a.m. and asked if everything was okay at the shop. Appellant said everything was okay, but told Robinson not to go back because Alicia had told her a lady had had a seizure. When Robinson asked if the lady was okay, appellant responded she did not know because she was not there. Although Robinson never saw Alicia the night of February 18, she knew she was at the shop because she saw her car outside.

Reid's daughter, Keaira Reid, testified that her mother received injections in her buttocks several times to enhance her body. Keaira once went with her mother to what she believed was a Deep Ellum location where Reid received injections, but Keaira waited outside in their truck for about three hours while her mother and some of her mother's coworkers went into the building. When they got home, Keaira saw that Reid had cotton balls glued to her buttocks and was wearing a "booty girdle." On February 18, 2015, the day before her body was discovered in the salon, Reid picked Keaira up from work and dropped her off at home at around 6:00 p.m. Reid then left and never returned. The next day, the police came to their home and told Keiara her mother had died.

There was evidence that appellant, who several witnesses knew as "Wee Wee," was in the business of providing what was described as a "Wee Wee booty" by injecting people's buttocks. Individuals who had received injections would refer others to appellant who would then arrange the location, time, and price for the procedure. Appellant and Alicia worked together performing injections as described by at least two witnesses.

Vivian Martinez testified she learned about appellant through a coworker. She was told appellant did "butt injections" and was given appellant's number in 2012. She called the number in 2015 to get injections because she wanted "a bigger butt." Appellant answered the phone and told her the injections were "water based and it was saline." When she was ready to get the procedure done, Martinez called appellant in the morning and scheduled an appointment for that evening. Appellant gave her the address, quoted a price of $520, and Martinez set up an

appointment time. Appellant identified herself as "Wee Wee" on both calls. Martinez confirmed the location where she received injections in her buttocks was 3815 East Side in Dallas. After Martinez arrived at the location, she called appellant and a person she later learned was called Alicia, escorted her into the salon. Martinez paid appellant $520 cash at the front desk and waited her turn. Martinez then went into the private room. There was another woman who was laying on a table face down. Martinez laid face down on the other table in the room after removing her clothes from the waist down. Alicia was on Martinez's right side and appellant was on her left. She had three injections on each side. After the injections, Martinez received a sheet of paper with aftercare instructions, cotton balls, and tube of super glue. Later that week, she learned on the television news about Reid who died at the same salon where she had just received her injections. Martinez contacted the police and went to the hospital to get checked out.

Lauren Johnson also received injections in her buttocks from appellant. Johnson testified that her friend, Mia, referred her to appellant. When Johnson had the money and was ready to get them, Mia gave her appellant's phone number, which Johnson confirmed at trial ending in 7982. Johnson called the number and received an address to go to. Johnson drove from Houston to a home in South Dallas to get the injections. It was close to midnight when Johnson called appellant to say she had arrived at the location. Johnson was let into the home while her boyfriend, who drove with her from Houston, waited in the car. Johnson waited her turn with other people who were there to get "butt injections." Appellant and a person she later learned was called "Alicia" were both performing injections on a woman on a massage table in the dining room of the home. Appellant was on the left side of the woman and Alicia was on the woman's right side. Another man was positioned at the woman's feet at the end of the massage table. The unidentified man was sucking up material from a container into syringes and placing them between the thighs of the

–4–

person on the table. Both appellant and Alicia worked together injecting the material in the syringes into the person on the table.

Johnson spoke to appellant before she had the injections. Appellant confirmed the price with Johnson and then explained the procedure and aftercare. Johnson paid $500 for the injections. She was told that she was being injected with "grade A medicated silicone." She wore a girdle with cutouts for the buttocks for about a week to help form the shape, and she had to put super glue, then cotton balls, on the injection sites until they stopped leaking. There were multiple syringes injected at each injection site. Johnson described the pain as worse than child birth and said Alicia gave her a Dum Dum sucker after Johnson told her she was sick to her stomach. Johnson said having appellant do the injections was referred to as having a "Wee Wee booty." Johnson testified that it was very obvious appellant was in charge. Johnson agreed that she got the injections because she felt like her bottom was small and she wanted it bigger. She did not perceive her bottom as being deformed.

In her call to 9-1-1 on the morning of February 19, Alicia told the dispatcher that she was with Reid at the shop "last night" and Reid said she felt sick. Alicia left Reid laying down at the shop and returned in the morning to find Reid "not moving" and "cold and hard." Police arrived at the scene shortly thereafter. Patrol officer Jay Angelino testified he observed Reid inside a private room laying face up on a medical or massage table. Officer Scott Bazan, a crime scene investigator arrived after Angelino. He observed Reid on the table as Angelino described. She was clothed, but her pants were pulled down just above the pubic area. There was a sheet underneath her that had a couple of blood stains on it. Reid had no shoes on and her purse was not in the room. There were two I.D. cards for Reid in the room. Officers testified the salon had some furniture and was very clean, but did not look like a working salon because there was no product, magazines, soap, towels, toilet paper in the bathroom, or garbage cans.

When the medical examiner arrived and rolled Reid on her side, one side of Reid's buttocks had a "cotton bandage" stuck to it while the other side of her buttocks had a "defect" out of which clear fluid leaked. Many photographs were taken, a plastic cap was collected from the carpet inside the room, and swabs were taken of the door handle to the private room inside the salon. The police also found a Blue Silverado truck parked outside the salon.[1] Testing later performed at the Southwestern Institute of Forensic Sciences (SWIFS) revealed appellant's DNA on the doorknob of the private room.

When lead detective Brian Tabor arrived at the scene on February 19th, he noted it looked like a working salon-type business, but it was sparsely furnished and so clean, it didn't look like anyone was working there. Alicia told him that Reid had come in the night before feeling ill and wanted a place to lie down. Alicia allowed her to lie down in the private room. Alicia had a key to the salon[2] and gave consent to search the premises. Tabor's description of the condition of Reid's body was consistent with the other officers' testimonies. She appeared to have injection sites and a clear liquid on her buttocks. After speaking with Reid's daughter, Tabor began looking for a person known as "Wee Wee."

Tabor learned Alicia lived at 2810 Birmingham Avenue[3] in Dallas, and appellant owned 3220 Meadow Street in Dallas which was down the street from the Birmingham address. Both properties were located close to the salon at 3810 East Side. Search warrants were executed simultaneously at the Birmingham and Meadow addresses. At the Birmingham address, police recovered, among other things, four 5-gallon buckets containing a clear unknown substance, a green bag containing medical supplies, several syringes, empty super glue packages, empty needle

---

[1] In her brief, appellant stated the truck belonged to Reid.

[2] Alicia told Tabor she had been given the key from appellant.

[3] There was evidence appellant's mother Willie Ross co-owned the property. Other evidence at trial indicated Willie Ross also had another address in Dallas, Texas.

boxes, an empty box of Dexametasona, Ace bandages, one Botox vial, 20 Lipoplus vials, a box of iodine swabs, liquid-filled syringes with needle caps on the end, and a vial of Kenalog. Some of the syringes found at the Birmingham address were similar to the cap found at the salon. At the Meadow address, the police recovered six vials of lidocaine HCL jelly, one vial of an unknown clear substance, one methenolone vial, and one bacteriostatic vial.

Detective Tabor requested Chad Medaris, a special agent with the U.S. Food and Drug Administration Office of Criminal Investigations, to test samples from the 5-gallon buckets found in the search along with tissue samples taken from Reid during the autopsy. Two FDA chemists using different testing techniques of analysis confirmed the substance in the white buckets and the samples of tissue and fluid from Reid were consistent with the presence of silicone. They did not determine the grade of silicone. Nor could they determine whether the silicone found in Reid came from the silicone in the buckets.

There was evidence, however, that appellant had purchased large amounts of silicone in the past in similar buckets. Cary Mellema, vice president and general manager of an industrial manufacturer of liquid silicone-based products, testified that his company sold product in the same size and style bucket as those recovered from the Birmingham location. He provided invoices showing appellant purchased hundreds of pounds of silicone products from his company in 5-gallon buckets and 1-gallon pails from May 2010 through February 2012.[4] He indicated silicone oil dimethylpolysiloxane lasts forever.

In addition to Robinson's testimony, appellant's cell phone records supported the conclusion that she was at the salon on the night of February 18 and documented communications between Reid's phone and appellant's phone, as well as Alicia's phone and appellant's phone. Various documents filed with the State indicated the phone number ending in 7982 was appellant's

---

[4] The invoices were to "Rochelle Ross" and listed appellant's phone number on the order entry worksheets.

"master phone." Police also confirmed Alicia's number ending in 6863, Reid's number ending in 8955 and Robinson's number ending in 2296.

Sy Ray from ZetX performed a geolocation analysis from appellant's T-Mobile phone records from February 18 through February 20, 2015. On the morning of February 18, there were calls between Alicia and appellant while appellant's phone was in an area around Fair Park that included the 3220 Meadow location. That afternoon, Reid's phone called appellant' number while appellant's phone was in Duncanville. Shortly thereafter, appellant's phone called Reid back. Around 5 p.m., appellant's phone began travelling back to the Fair Park area. At around 5:55 p.m., Reid called appellant and a minute later appellant's phone sent Reid a text message while the phone was very close to the salon. Appellant's phone stayed in the area for the next two hours and sent Reid two text messages around 8:15 p.m. At 8:23 p.m., appellant called Alicia while the phone was moving south around the Birmingham address area. Over the next two hours, appellant's phone moved between the Birmingham address and the Meadow address, back near the salon for about forty-five minutes, then returned to the Birmingham address for about an hour before moving to the Meadow address and proceeding further east. Both Alicia and Robinson called appellant early on the morning of February 19 while appellant's phone was in Mesquite.

Dr. Stephen Lenfest performed the autopsy on Reid on February 20, 2015. He testified that she had some very early stages of decomposition. There were cotton balls glued to the left buttock and a 1/16th of an inch puncture wound on the right buttock that had a clear, slightly viscous, material seeping from it. There was a similar puncture wound and liquid under the cotton balls on the left side. The FDA lab later confirmed the presence of silicone in the tissue samples sent to it. Lenfest opined Reid's cause of death was silicone pulmonary embolism from the silicone that was injected into her buttocks; the silicone entered into blood vessels and travelled first to Reid's heart and then to her lungs where it became trapped and caused tissue damage and

hemorrhaging. Lenfest further indicated the death was a homicide as silicone injections are known as a high risk procedure that the FDA has outlawed since the 1960s and 1970s except for one specific type of eye surgery. He concluded that injecting someone with silicone is an act clearly dangerous to human life and that the silicone would be considered a deadly weapon. Lenfest thought Reid had died at least four to eight hours before she was found on the morning of February 19. He also indicated that based on the state of decomposition of the body, the injections were probably done not more than eighteen hours, and no less than four hours, before the body was found.

Dr. Robert Bredt from the Texas Medical Board testified the Board has broad authority to define what acts constitute the practice of medicine. According to Bredt, a person who is injecting silicone into someone's body would be practicing medicine because it meets the definition of the practice of medicine within the statute and within the Board's rules, specifically those dealing with nonsurgical cosmetic procedures. He indicated injections done for enhancement constitute treatment for deformity because those cosmetic procedures are treating a deformity perceived by the patient. He noted plastic surgery for breast augmentation is considered the practice of medicine. He also indicated administrative rules provided nonsurgical cosmetic procedures are defined as the practice of medicine. Bredt indicated that to practice medicine in Texas, a person must be licensed by the State and there were no records on file with the Board that either appellant or Alicia were licensed to practice medicine in Texas. Bredt further testified injecting industrial grade silicone into a woman's body or buttocks could be an act clearly in risk to human life. He also stated the silicone injections could be a deadly weapon because they could be life threatening.

The only witness to testify for the defense at the guilt/innocence stage of trial was Joshua Dodd. Dodd stated at about 1:00 a.m. on February 19, 2015, he left a bar in the Deep Ellum area to visit friends who lived next door to 3815 East Side Avenue. As he was driving there, a dark

–9–

colored, good sized truck was tailgating behind him. After Dodd parked his car in front of his friend's loft, the truck swerved around him and parked directly in front of 3815 East Side. Dodd saw who he later identified as Alicia get out of the passenger's side of the truck. He did not know whether or not someone else was in the driver's side. Todd did not see Alicia go into the building. At trial, Dodd identified the truck found outside the salon on February 19 as the same truck he saw the previous night.

## ANALYSIS

### A. Standard of Review

In three issues, appellant challenges the sufficiency of the evidence to support her felony murder conviction based on practicing medicine without a license, specifically arguing (1) there is no evidence that appellant received any money from Reid, (2) there is no evidence that performing silicone injections for purely vanity reasons constitutes the practice of medicine under the definition in the occupations code, and (3) there was no evidence that appellant injected Reid with silicone or assisted Alicia in doing so.

We review sufficiency of the evidence challenges under well-established standards. *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Brooks v. State,* 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.).[5] To evaluate the sufficiency of the evidence, an appellate court must view the combined and cumulative force of the evidence in the light most favorable to the verdict to determine whether, based on the evidence and all reasonable inferences therefrom, any rational trier of fact could have found each element of the offense beyond a reasonable doubt. *Ramsey v. State*, 473 S.W.3d 805, 808 (Tex. Crim. App. 2015). The jury, as sole judge of the witnesses' credibility and the weight to be given their testimony, is free to accept or reject any

---

[5] Although appellant argues the evidence is legally and factually insufficient to support her conviction, we address her sufficiency challenges under the single standard for evaluating sufficiency of the evidence to support a finding required to be proven beyond a reasonable doubt. *See Brooks*, 323 S.W.3d at 895.

or all of the evidence presented by either side. *Jones v. State,* 333 S.W.3d 615, 620 (Tex. App.—Dallas 2009, pet. ref'd).

Appellate review does not intrude on the jury's role to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Instead, the appellate court presumes the fact finder resolved any conflicting inferences in favor of the prosecution and defers to that resolution. *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (per curiam). In analyzing legal sufficiency, we therefore "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007)). Direct and circumstantial evidence are equally probative in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *See Hooper*, 214 S.W.3d at 13. The standard of review is the same for both direct and circumstantial cases. *See Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). Each fact need not point directly and independently to the defendant's guilt so long as the cumulative force of all the evidence, when coupled with reasonable inferences to be drawn from that evidence, is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Legally sufficient evidence need not exclude every conceivable alternative to the defendant's guilt, *Ramsey*, 473 S.W.3d at 811.

## B.     Practicing Medicine Without a License

Appellant was charged with causing Reid's death. The indictment alleged that on or about February 18, 2015, appellant intentionally, knowingly, and recklessly committed "the felony offense of Practicing Medicine without a License, and while in the course of and in furtherance of the commission of said felony, [appellant] committed an act clearly dangerous to human life, to

–11–

wit: by injecting Wakesha Reed[sic] with silicone, a deadly weapon, and did thereby cause the death of . . . Wakesha Reid."

Pursuant to the Texas Occupations Code, a person commits a third-degree felony if she practices medicine without a license and causes another physical or psychological harm. *See* TEX. OCC. CODE ANN. § 165.153 (West 2012). Practicing medicine is defined in the occupations code as the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who either (1) publicly professes to be a physician or surgeon or (2) directly or indirectly charges money or other compensation for those services. *See* TEX. OCC. CODE ANN. 151.002(a)(13) (West Supp. 2017).

Under the law of parties, a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both. TEX. PENAL CODE ANN. § 7.01(a) (West 2011). Under section 7.02(a), a person is criminally responsible as a party if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2). In determining whether the accused participated as a party, the court may look to events occurring before, during, and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to commit the offense. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994); *Burdine v. State*, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986).[6]

In her first issue, appellant argues the evidence is insufficient to support her conviction because there was no evidence that either appellant or Alicia charged Reid money for injections

---

[6] Although the indictment against appellant did not plead law of parties, the jury charge contained instructions on the law of parties. *See Marable v. State*, 85 S.W.3d 287, 287 (Tex. Crim. App. 2002) (en banc) (law of parties need not be pled in the indictment).

–12–

she received on the night she died. We disagree. Although there is no direct evidence as to what Reid paid appellant or Alicia for the injections that ultimately caused her death, there was considerable evidence that appellant charged money for performing injections. Johnson testified she paid $500 for injections from appellant and Martinez testified that she paid $520 to appellant for injections. Both women went to locations where other people were also getting injections from appellant. Robinson also testified that when appellant offered to help pay rent if Robinson found a salon to lease, appellant was working doing "butt shots." Robinson testified that on the night of February 18, there were people in the salon waiting area that were not her clients. Finally, Reid's daughter, Keaira, indicated that her mother had received injections about three times before February 18. Keaira once went with her mom to the Deep Ellum area and waited in the truck while Reid got injections. After speaking with Keaira, Tabor tried to locate "Wee Wee," which was a new name to him at that point. Several witnesses testified they knew appellant as Wee Wee. Viewed in the light most favorable to the verdict, a rational jury could have made the reasonable inference that Reid, like others who received injections from appellant and Alicia, paid for them. We therefore conclude the evidence is sufficient to support a finding that appellant, acting individually or as party, charged Reid for the injections she received on the night she died. We resolve appellant's first issue against her.

In her second issue, appellant contends the evidence is insufficient to establish she was practicing medicine because "injecting a substance into another person purely for vanity reasons" does not fall within the occupations code's definition of "practicing medicine." Dr. Robert Bredt from the Texas Medical Board testified that a person injecting silicone into another person constitutes the practice of medicine because it meets the definition in the statute and the Board's rules addressing nonsurgical cosmetic procedures. He noted injections performed for enhancements constitute a treatment for deformity because of a deficiency perceived by the

–13–

patient. Although none of the witnesses who received the injections indicated they viewed their buttocks as deformed, they clearly wanted their buttocks to be larger than they were, and thus perceived them as too small. Accordingly, there was sufficient evidence from which a reasonable jury could have found that injecting silicone into Reid's buttocks constituted "practicing medicine." *See Agripino v. State*, 217 S.W.3d 707, 714–15 (Tex. App.—El Paso 2007, no pet.) (evidence was sufficient to establish injections for vanity reasons constituted practicing medicine based on similar testimony from representative of State Board of Medical Examiners). We therefore resolve appellant's second issue against her.

In her third issue, appellant argues the evidence is insufficient to support her conviction because it fails to show she, individually or as a party, injected Reid with silicone, thereby causing her death. Although there was no direct evidence as to who performed the injections on Reid's buttocks, including the ones she received on the night she died, there was ample circumstantial evidence from which the jury could conclude that either appellant or Alicia with appellant's assistance administered the injections.

Reid was found dead in the room that, according to Robinson, Alicia and appellant used to perform "butt injections." After Tabor spoke to Reid's daughter about her mother's death, he began to look for a person called "Wee Wee," the name several witnesses called appellant. Reid called appellant's phone at 3:08 p.m. on February 18th and appellant's phone contacted Reid's phone at 3:21 p.m. the same day. At around 5 p.m. that evening, appellant's phone began moving towards the Fair Park area of Dallas. At 5:54 p.m. Reid called appellant and who then sent a text to Reid while appellant's phone was very close to 3815 East Side. Appellant's phone remained near that location for the following two hours. The jury could have inferred from these records and the geolocation analysis of appellant's phone that appellant and Reid were present at the salon together on February 18. Additionally, on the evening of February 18, Robinson saw appellant

–14–

twice exit the room in which Reid was found dead the next morning. The first time was at about 6:30 when appellant came out of the private room to tell Robinson to turn up the radio and then again thirty to forty-five minutes later when she came out of the room to tell everyone to leave. Appellant's phone was also in the vicinity of the salon for about forty minutes from 8:43 to 9:30 p.m. that evening. The only DNA found on the door handle of the private room was that of appellant.

Although appellant argues there is no evidence she had her phone in her possession during the relevant times, evidence from other witnesses who had injections by appellant suggests appellant's use of her phone on February 18 was consistent with how she used her phone with previous clients. Moreover, the phone was in appellant's possession on the morning of February 19 when Robinson called her to see if it was okay to return to the salon. Appellant's previous clients also testified that appellant and Alicia performed injections on them simultaneously. Viewed in the light most favorable to the verdict, we conclude the evidence was sufficient for a rational jury to infer appellant was present in the private room in the salon on February 18 when appellant and/or Alicia injected Reid with silicone ultimately causing her death.

In reaching this conclusion we necessarily reject appellant's contention that a conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of guilt of the defendant. Although inferences based on mere speculation are insufficient to support a conviction, the State's evidence need not exclude every reasonable hypothesis except defendant's guilt. *See Ramsey*, 473 S.W.3d at 808 n.3, 809. It is sufficient that the evidence viewed in the light most favorable to the State's case, supports the incriminating inference that appellant, individually or as a party, injected Reid with silicone thereby causing her death. *See id*. We therefore resolve appellant's third issue against her.

### C.    State's Cross-Issue

In its cross-issue, the State requests that we modify the judgment to correctly reflect that the jury made an affirmative deadly weapon finding. We agree. The record reflects that in response to a special issue, the jury unanimously found that appellant used or exhibited a deadly weapon, namely silicone, in the commission of the offense. The trial court's judgment however, incorrectly indicates "N/A" under the heading "Findings on Deadly Weapon."

The court has the power to modify an incorrect judgment to make the record speak the truth when it has the necessary information before it to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991 pet. ref'd). Here, this Court has the necessary information to correct the trial court's judgment to include a deadly weapon finding. Accordingly, we modify the "Judgment of Conviction By Jury" to include an affirmative deadly weapon finding by deleting "N/A" and replacing it with "Yes, not a firearm" under the heading "Findings on Deadly Weapon."

### CONCLUSION

Based on the record before us, we conclude the evidence is sufficient to support appellant's conviction. We modify the trial court's judgment to include an affirmative deadly weapon finding. As modified, we affirm the trial court's judgment.

/David Evans/
DAVID EVANS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
170346F.U05

–16–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DENISE ROCHELLE ROSS, Appellant

No. 05-17-00346-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-15-75745-Q.
Opinion delivered by Justice Evans, Justices Lang-Miers and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

Under the heading "Findings on Deadly Weapon" we delete "N/A" and replace it with "Yes, not a Firearm."

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 20th day of August, 2018.